830 P.2d 1031 (1992)
In the Matter of the Title, Ballot Title and Submission Clause, and Summary Approved February 5, 1992, for the PROPOSED INITIATED CONSTITUTIONAL AMENDMENT CONCERNING UNSAFE WORKPLACE ENVIRONMENT.
Margaret W. Carpenter, Thomas Lew Jackson, Maureen A. Sullivan, Petitioners, and
Craig C. Eley and Jack Hawkins, Respondents. and
Natalie Meyer, Raymond T. Slaughter, and Douglas G. Brown, Title Setting Board.
No. 92SA92.
Supreme Court of Colorado, En Banc.
June 1, 1992.
*1032 Kathleen E. Haddock, Denver, for Margaret W. Carpenter.
Berry & Singer, John Berry, Denver, for Thomas Lew Jackson.
The Klapper Firm, Gail H. Klapper, Maureen A. Sullivan, Denver, for Maureen A. Sullivan.
Jack Hawkins, Craig C. Eley, Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Denver, for Title Setting Bd.
Chief Justice ROVIRA delivered the Opinion of the Court.
This review proceeding was initiated by petitioners, Margaret W. Carpenter, Thomas Lew Jackson, and Maureen A. Sullivan, to challenge the title, ballot title and submission clause, and summary prepared by the Title Setting Board (Board)[1] on the initiative for a constitutional amendment concerning liability for knowing maintenance of an unsafe workplace.[2] Petitioners assert that the title, ballot title and submission clause, and summary are vague, misleading and fail to express the true meaning and intent of the proposed initiative. Petitioners Jackson and Carpenter further assert that upon rehearing, the Board was improperly constituted because one of the three members was absent. We disagree and accordingly affirm the Board.

I
In September 1991, Craig C. Eley and Jack Hawkins, proponents of the initiative, submitted the initiative to the directors of the legislative council and the office of legislative legal services in the following form:
Anyone who, in the course of business, knowingly maintains an unsafe work environment shall not be immune from suit for a resulting injury or death by a worker and his or her survivors for any and all damages and losses.
A comment and review meeting took place in October 1991, before the legislative council and the office of legislative legal services. At that meeting, Eley stated that he did not think that the amendment would apply to governmental entities, charities, or homeowners. The initiative was then delivered to the secretary of state who convened the Board.
In response to a request from the Board, the Office of State Planning and Budget (OSPB) and the Department of Local Affairs (DLA) submitted statements of fiscal impact to the state and local governments. The measure was then submitted to the Board which held a public meeting. Eley was questioned by Board members about whether he intended the measure to apply to the public sector. He responded that it was his intent to include the public sector only to the extent that the entity is engaged in business and further testified that "any clarification could give an incorrect impression, coming down either one way or the other. This certainly does not by its terms exclude, specifically, governmental agencies, and to the extent that the term `in the course of business' includes them, I suppose it would." Upon suggestion by the secretary of state that the words "private sector" be inserted before "business," Eley stated that such a change would express his intent and he would not object to either the use of "private sector" or "non-governmental." *1033 Later, again discussing amendments to the language of the title, ballot title and submission clause, and summary, and the reasons for Eley's concern about amending the measure to reflect its exclusion of the public sector, Eley stated that he did not want to alter the language of the initiative because of the delay that would result and that he wanted to "keep the amendment as simple as possible so it could be understood by the man in the street." Later, a Board member commented that he was not inclined to insert the words "private sector" because such addition expresses an interpretation of the measure which Eley was not willing to reflect upon it. Eley responded: "Whether the amendment expresses my general intent is open to question someday." The Board designated and fixed the following title:
AN AMENDMENT TO THE COLORADO CONSTITUTION TO PROVIDE THAT ANYONE WHO, IN THE COURSE OF BUSINESS, KNOWINGLY MAINTAINS AN UNSAFE WORK ENVIRONMENT SHALL NOT BE IMMUNE FROM SUIT FOR A RESULTING INJURY OR DEATH BY A WORKER AND HIS OR HER SURVIVORS FOR ANY AND ALL DAMAGES.
The ballot title and submission clause as designated and fixed by the Board is as follows:
SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION TO PROVIDE THAT ANY-ONE WHO, IN THE COURSE OF BUSINESS, KNOWINGLY MAINTAINS AN UNSAFE WORK ENVIRONMENT SHALL NOT BE IMMUNE FROM SUIT FOR A RESULTING INJURY OR DEATH BY A WORKER AND HIS OR HER SURVIVORS FOR ANY AND ALL DAMAGES?
Lastly, the summary as prepared by the Board stated:
This measure adds a provision to the Colorado Constitution to provide that anyone who, in the course of business, knowingly maintains an unsafe work environment shall not be immune from suit for a resulting injury or death by a worker and his or her survivors for any and all damages and losses.
The adoption of this measure would result in fiscal impact on state and local governments which are indeterminate.
Petitioners moved for rehearing. The original date scheduled for rehearing was vacated because two of the Board members were unable to attend. A rehearing was held with two of the three Board members present. The secretary of state was unable to attend the rescheduled rehearing. At the rehearing, the discussion again focused on whether the proponent intended application of the measure to the public sector. Eley stated, "My intent simply is that if you are not in the course of business, this initiative does not apply to you. And anyone can take a pot shot as to what they think that applies to and doesn't apply to. I think a fair restatement of the amendment has been done." A Board member questioned Eley about whether it was his intent that the wording remain vague so that the courts would interpret it and he answered affirmatively, declaring: "My intent is that the wording stay just the way it is, obviously; and if it's vague in some respects, I apologize but I'm not going to change it." The two Board members present at the rehearing voted not to change the language of the title, ballot title and submission clause, and summary.

II
The petitioners argue that the proposed amendment was not intended to apply to the public sector, and the title, ballot title and submission clause, and summary, as fixed by the Board, therefore, contain an ambiguity rendering them infirm under section 1-40-102(2), 1B C.R.S. (1991 Supp.), for failure to state the true meaning and intent of the proposed amendment. Petitioners also argue that failure to enact more exacting definitions of such terms as "knowingly," "unsafe," "environment," "maintains," and "any and all damages" renders the descriptions of the initiative as fixed by the Board vague and unclear and the title, ballot title and submission clause, *1034 and summary, therefore, fail to clearly inform the voters of the content of the proposed initiative.
The Colorado Constitution grants the people the authority to initiate constitutional amendments or propose laws. Colo. Const. art. V, § 1. We have recently set out the procedure by which such proposals are then set for inclusion on the general election ballot so that the people are apprised of the nature of the initiative and ultimately determine whether such initiative becomes part of the constitution or laws of the state. In re the Title, Ballot Title and Submission Clause, and Summary Adopted February 19, 1992, Pertaining to the Proposed Tobacco Tax, 830 P.2d 984, 988-989 (Colo.1992). Our review of the Board's actions is guided by the standards recently set forth in In re the Title, Ballot Title and Submission Clause Approved September 4, 1991, with Regard to the Proposed Initiated Constitutional Amendment Concerning Limited Gaming in Manitou Springs, Fairplay and in Airports, 826 P.2d 1241, 1245 (Colo.1992) (hereinafter In re Gaming in Manitou Springs). We focus not on the merit of the proposed amendment but only on whether the title, ballot title and submission clause, and the summary "accurately reflect the central features of the initiated measure in a clear and concise manner...." Id. The Board's role in setting a title is to "correctly and fairly express the true intent and meaning" of the proposed law. Additionally, the Board should set a title which will not mislead voters as to the effect of a "yes" or "no" vote. § 1-40-102(2), 1B C.R.S. (1991 Supp.).
In determining whether the descriptions affixed by the Board express the true intent and meaning of the proposal, consideration of testimony from the proponent is appropriate. The proponent of the measure best understands the reasons for initiating the change or addition to the constitution or statutes. Furthermore, the statute requires public meetings for the fixing of such descriptions. § 1-40-101(2), 1B C.R.S. (1991 Supp.). If testimony from such meeting could not be considered by the Board, the requirement of a public meeting would be meaningless. We therefore examine Eley's testimony concerning the intent in not differentiating between private sector and public sector business when stating the entities to which this initiative would apply and in not further refining the definitions of any of the terms in the measure.
Despite earlier internally contradictory testimony from Eley, he clearly stated at the rehearing that he intended the language to remain vague so that the courts could interpret its application to governmental agencies. As in In re the Title, Ballot Title and Submission Clause, and Summary of Proposed Constitutional Amendment under the Designation "Pregnancy", 757 P.2d 132, 135-36 (Colo.1988), where the Board utilized the initiative's language nearly verbatim when it fixed the title, ballot title and submission clause, and summary, the Board's designations here very closely mimic the language in the initiative. Eley refused to change the language in the proposal delivered to the legislative council and the office of legislative legal services, stating that, as drafted, it represented his intent.
We conclude that the title reflects the intent and central features of the amendment despite the lack of language differentiating the entities to which the initiative would apply or further refining the definitions of terms. Likewise, the ballot title and submission clause express the intent and meaning of the initiative.

III
Petitioners also argue that the summary is statutorily insufficient because it does not clearly express the meaning of the proposed amendment and its failure to contain an estimate of the fiscal impact on the state and local governments renders it misleading and likely to cause confusion. In adopting a summary of a proposed amendment, the Board is guided by section 1-40-101(2), 1B C.R.S. (1991 Supp.):
The board shall prepare a clear, concise summary of the proposed law or constitutional amendment. The summary shall *1035 be true and impartial and shall not be an argument, nor likely to create prejudice, either for or against the measure. The board may request assistance in the preparation of the summary from the legislative council and, if, in the opinion of the board, the proposed law or constitutional amendment will have a fiscal impact on the state or any of its political subdivisions, shall request assistance in such matter from the office of state planning and budgeting or the department of local affairs.... The legislative council, the office of state planning and budgeting, and the department of local affairs shall furnish any assistance so requested, and the summary shall include an estimate of any such fiscal impact, together with an explanation thereof.
The summary here is almost identical to the title with the addition of the fiscal impact statement. "If the chosen language fairly summarizes the intent and meaning of the proposed amendment, without arguing for or against its adoption, it is sufficient." In re the Title, Ballot Title and Submission Clause, and Summary including the estimate of Fiscal Impact and Explanation Thereof Pertaining to the Mineral Production Tax Initiative, 644 P.2d 20, 25 (Colo.1982). Additionally, a summary should be a condensed, impartial statement. Its purpose is not to fully educate the voters on all aspects of the proposal. In re Gaming in Manitou Springs, 826 P.2d at 1244-45. Having already found that the title sufficiently expresses the meaning and intent of the initiative, we apply this same reasoning to the summary statement and find that it summarizes the intent and meaning of the proposal.
Additionally, petitioners assert that the fiscal impact was not indeterminate because the Board received from the OSPB and the DLA letters setting forth the estimated fiscal impact. Consequently, this information should have been contained in the summary.
The DLA first submitted a letter to the Board expressing the opinion that, since governmental immunity would not be abrogated by the initiative, the measure would have no fiscal impact on the local governments of the state. Those comments were subsequently rescinded by the DLA after the Department concluded that there would be fiscal impact on local governments regardless of whether governmental immunity applied. The DLA then estimated this impact on local governments to be approximately between $139.8 million and $266.2 million.
The OSPB also provided the Board with a fiscal impact statement. The OSPB estimated that the Division of Insurance would experience the greatest impact because employers' liability for increased workers' compensation insurance premiums and payouts for the self-insured would be approximately $802.5 million. Furthermore, while the OSPB categorized and estimated fiscal impact to the Judicial Department, the Division of Risk Management, and the Division of Workers' Compensation, the OSPB stated that the impact on state revenues would be "large" and "indeterminate" and did not reach a comprehensive estimate of fiscal impact.
While a separate explanation of the fiscal impact is preferred, a definitive fiscal impact statement is not required where, due to the variables or uncertainties inherent in the particular issue, the fiscal impact cannot reasonably be determined from the materials submitted to the Board. In re Title, Ballot Title and Submission Clause, and Summary Adopted May 16, 1990 by the Board and Pertaining to the Proposed Initiative Under the Designation "Tax Reform", 797 P.2d 1283, 1291 (Colo.1990); In re Initiative Concerning Casino Gaming, 649 P.2d 303, 307 (Colo.1982). Here, the Board was presented with a different estimate of fiscal impact on several branches of state and local government. However, as discussed, the language of the initiative purposefully leaves open the question of whether the amendment applies to such entities. In light of this large variable, the Board's conclusion that the fiscal impact is indeterminable is reasonable.

*1036 IV
Lastly, petitioners Jackson and Carpenter argue that only two members of the three-member Board may not rehear a challenge to the title, ballot title and submission clause, and summary. The statute, they assert, requires all three members to be present at the title setting hearing with a majority controlling, and they urge this court, therefore, to require all three members' presence for all hearings of the Board.
The Board is composed of the secretary of state, the attorney general, and the director of the office of legislative legal services or the director's designee. § 1-40-101(2), 1B C.R.S. (1991 Supp.). At the rehearing concerning this initiative, the secretary of state was absent but the other two members were present. Although at the title setting hearing, one of the Board members voted against the motion to adopt the title, ballot title and submission clause, and summary, at the rehearing, both members present voted not to change the language. By statute, a majority of this Board controls. Id. Additionally, section 2-4-110, 1B C.R.S. (1980), provides that "[a] grant of authority to three or more persons as a public body confers the authority upon a majority of the number of members fixed by statute." There is no statutory provision, as exists for example in the Colorado Corporation Code, that requires a majority vote of a quorum to act. See, e.g., § 7-3-101.5(5)(b)(I), (II), 3A C.R.S. (1986). Therefore, where a three-member board has authority to act, the majority of that three-member boardtwo membersalso has that authority. Consequently, since upon rehearing two members voted to affirm, we find that the Board acted within its statutory grant of power.
Accordingly, we affirm the Board's adoption of the title, ballot title and submission clause, and summary.
NOTES
[1] The Board is composed of the secretary of state, the attorney general, and the director of the office of legislative legal services or the director's designee. § 1-40-101(2), 1B C.R.S. (1991 Supp.).
[2] The proceeding is brought pursuant to section 1-40-102(3)(a), 1B C.R.S. (1991 Supp.). Petitioners are registered electors in the State of Colorado.